J-S40024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ATIBA WICKER | : | |
| | : | |
| Appellant | : | No. 2933 EDA 2022 |

Appeal from the PCRA Order Entered October 6, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002843-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ATIBA WICKER | : | |
| | : | |
| Appellant | : | No. 2934 EDA 2022 |

Appeal from the PCRA Order Entered October 6, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002844-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ATIBA WICKER | : | |
| | : | |
| Appellant | : | No. 2936 EDA 2022 |

Appeal from the PCRA Order Entered October 6, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002845-2012

BEFORE: NICHOLS, J., SULLIVAN, J., and COLINS, J.*

MEMORANDUM BY SULLIVAN, J.: **FILED MAY 7, 2024**

Atiba Wicker ("Wicker") appeals *pro se* from the order dismissing his serial petition for relief under the Post Conviction Relief Act ("PCRA").[1] We dismiss the appeal.

This Court has previously summarized the facts of this case as follows:

Philadelphia Police Officer Tamike Reid testified that, at approximately 7:45 p.m. on October 2, 2011, she was driving to work . . . when she observed four males standing outside La Pearl Bar, located at 54th Street and Haverford Avenue in . . . Philadelphia. As she approached, she observed a taller male, she described as appearing to be the "bouncer or security" strike another shorter male. She pulled to the corner and observed the shorter male get into a black Mercedes and drive away. [Officer Reid] . . . [did not] take further action because she was not in full uniform and had no radio to call for backup.

Later, while on duty, [Officer Reid] heard a citywide high priority radio call announcing, "Cars stand by, 19th District, 54th and Haverford, report of a shooting at La Pearl Lounge." She immediately drove to La Pearl . . . reported her earlier observations to the assigned detective[,] and later in the evening gave him a detailed statement of her observations.

Philadelphia Police Detective Robert Daly testified . . . at approximately 8:30 p.m. he was assigned as the lead investigator to investigate the shooting at La Pearl. On arriving there at approximately 9:00 p.m.[,] he immediately noticed fired cartridge casings on the ground and bullet holes in the front door. Detective Daly . . . interviewed and took photographs of Mr. Alvin Chandler [("Mr. Chandler")] who had been injured by flying glass. He testified that Mr. Chandler told him he was at the door at the time

_____

* Retired Senior Judge assigned to the Superior Court.

[1] **See** 42 Pa.C.S.A. §§ 9541-9546.

of the shooting but was unable to give him a description of the shooter.

After completing his initial investigation at La Pearl, Detective Daly [went] to the Hospital of the University of Pennsylvania to interview the other two victims of the shooting, Ms. Keisha Beckles [("Ms. Beckles") and Mr. James Rice [("Mr. Rice")]. He described Ms. Beckles injuries as . . . a large gash across her upper lip and out the side . . .. After interviewing Ms. Beckles, [Detective Daly] next interviewed Mr. Rice . . .. He described Mr. Rice's room as having an open door and filled with his friends. He took a brief statement from Mr. Rice in which he told Detective Daly that he had seen the shooter but gave no description.

Detective Daly returned to the Hospital the next day with a photo array he had compiled from information gathered as a result of his investigation. This array did not contain a photograph of [Wicker]. Although Mr. Rice was unable to identify anyone from the array, he . . . told Detective Daly that, "Yeah, I'll be able to I.D. him."

As the investigation continued, Detective Daly maintained contact with Mr. Rice, who refused to come into the offices of Southwest Detectives, because "he was very apprehensive . . .." On October 25, 2011[,] Detective Daly eventually got Mr. Rice to meet with him at Central Detective Division because it has an underground entrance . . .. At this meeting, using the description of the shooter given to him by Mr. Rice, Detective Daly created a large computer[-]generated photo array. Mr. Rice identified the photograph of one individual, not [Wicker], as looking like the shooter but was certain the person was not the shooter.

Detective Daly testified that on November 6, 2011, he received a phone call from Mr. Rice saying, "the boy that shot me just called me" from a blocked caller I.D. number. On November 10, 2011, after spending several days tracing the call back through Mr. Rice's phone carrier, Detective Daly recovered the blocked number and called it, reaching Ms. Jacquetta Rouse. She told him that on November 6th she had been on a date with [Wicker], whom she just knew as "T," but was unaware of any phone call made to Mr. Rice. She also gave Detective Daly [Wicker's] phone number. Based on the information he received from Ms. Rouse, Detective Daly, was able to identify [Wicker] and prepared a photo

- 3 -

array containing [Wicker's] photo. On November 11, 2011, he displayed the array to Mr. Rice, who immediately identified [Wicker] as the shooter.

Mr. [] Rice testified that on, Sunday, October 2, 2011, he was employed at La Pearl Bar . . . providing security at the front door.

[Mr. Rice] testified that between approximately 7:30 to 7:45 p.m. [Wicker] threw a drink on one of the dancers in the establishment. On seeing this, he walked over to [Wicker] saying to him, "Come on outside. Let me talk to you for a minute." After going outside[,] [Wicker] appeared to be receptive to Mr. Rice's concerns when another patron, Julius Faison [("Faison")], came outside. Faison engaged [Wicker] in an argument over the drink having spilled on him as well. The verbal argument soon led to an exchange of blows between the two of them. [Wicker] then went to his car and drove off.

Mr. Rice testified that approximately thirty to forty minutes later [Wicker] returned with a gun and asked Mr. Rice, "Where did that guy go?" Being preoccupied, [Mr. Rice] responded, "He's not here. Give me a second." When others noticed the gun, Mr. Rice got everyone inside the bar and closed the door behind him. Seconds after closing the door, Mr. Rice heard gunshots and was struck in the back by a bullet. He also testified that two other people were injured as a result of the shooting.

Mr. Rice was then driven to the hospital in a police car for treatment. After receiving treatment, Mr. Rice testified he gave a statement to the investigating detective.

When asked on direct examination why the statement he made to Detective Daly in the hospital differed from his testimony at trial[,] he responded, because "there was probably people inside the hospital with me, and I'm not going to be talking to the police." When asked why he would not meet with Detective Daly in his offices at 55th and Pine Streets, Mr. Rice replied, "It's my neighborhood. I wasn't going. I would have never went there." He also testified that he had pointedly refused Detective Daly's request to meet him in his office.

Mr. Rice testified that on November 6, 2011, he received a phone call at approximately 2:30 p.m. from a blocked phone

number. The first voice he heard was a female voice followed by a male voice who identified himself "T" or "D," "[t]he person that shot you" who then said, "Don't worry about it I'll cut you a check."

Mr. Rice immediately called Detective Daly to report this call. Subsequently, on November 11, 2011, he met with Detective Daly who showed him a photo array from which he identified [Wicker's] picture.

Ms. Jacquetta Rouse testified that shortly after being on a date with [Wicker][,] she received a phone call from detectives inquiring about [Wicker] and his use of her cell phone. She told them that at the time she only knew [Wicker] as "T" and gave them his phone number. She further testified that she was not aware that [Wicker ] had used her phone nor did she know Mr. Rice. She also testified that [Wicker] later admitted to her that he had used her phone because he had something he wanted to straighten out.

Ms. Nicole Cooper testified that [Wicker] has been her boyfriend since 2009. She also testified that on the evening of October 2, 2011, she encountered [Wicker] at La Pearl and got into a heated argument, each upset that the other was there. After the argument [Wicker] walked away and she didn't see him until later that night. When asked about the shooting[,] she testified, "[S]omething did happen while I was there because I ran out." "I didn't see anyone get shot."

FBI Special Agent William Shute . . . currently assigned to the FBI's Cellular Analysis Survey Team, was qualified, without objection, as an expert in the field of historical cell site analysis. Analyzing [Wicker's] cell phone usage records, Agent Shute testified that, on October 2, 2011: 1) at 6:41 p.m., [Wicker's] cell phone was located in the vicinity of 11th and Spring Garden Streets . . . east of La Pearl; 2) at 7:07 p.m., usage of the phone began to move; 3) at 7:29 p.m., [the phone was] in the immediate vicinity of La Pearl; 4) at 7:46 p.m. the phone [was] on the move away from La Pearl heading in the westerly direction; 5) at 8:20 p.m, [the phone was] in the vicinity of Cobbs Creek Parkway and Walnut Street, west of La Pearl; 6) at 8:27 p.m., [the phone was] in the vicinity of 63rd Street and Lebanon Avenue, west and north of La Pearl; and 7) at 8:40 p.m., [the phone was] in the vicinity of Fairmount Park, east of La Pearl. Agent Shute also testified that there were no calls logged on [Wicker's] phone between 8:27 to 8:40 . . .. He further testified that the route between the cell

sites of these two calls[] would have taken [Wicker] through three cell towers, one of which is located in the vicinity of La Pearl. The usage records indicate that [Wicker] travelled directly back to his starting point at 11th and Girard from the location of the 8:40 call.

*See Commonwealth v. Wicker*, 2015 WL 6696906 (Pa. Super, August 13, 2015), citing Trial Court Opinion, 9/16/14, at 5-11.

Wicker's first trial ended in a mistrial. In June 2013, a jury convicted Wicker of three counts of aggravated assault, and recklessly endangering another person ("REAP"), and the trial court then convicted him of persons not to possess a firearm. In December 2013, the trial court imposed an aggregate sentence of thirty-one to seventy-two years of imprisonment. This Court affirmed Wicker's judgment of sentence. *See Wicker*, 2015 WL 6696906. The Pennsylvania Supreme Court denied allowance of appeal. *See Commonwealth v. Wicker*, 130 A.3d 1290 (Pa. 2006).

Wicker filed a first PCRA petition *pro se* in 2016, and the court appointed counsel, who filed an amended PCRA petition in 2017. The court denied relief in 2018, and Wicker appealed. This Court quashed Wicker's appeal pursuant to *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), because Wicker filed one notice of appeal from three separate dockets. *See Commonwealth v. Wicker*, No. 2244 EDA 2018 (Pa. Super. 2019) (unpublished judgment order). The Supreme Court denied allowance of appeal on Marh 24, 2020. *See Commonwealth v. Wicker*, No. 518 EAL 2019 (Pa. 2020).

In December 2021, Wicker filed a *pro se* PCRA petition and accompanying memorandum of law, in which he alleged the existence of

newly-discovered evidence concerning Detective Michael DeRose, Officer Daniel Mason, and Detective Freddie Mole. *See* Wicker's PCRA Petition, 12/21/21, at 3; Wicker's Memorandum of Law at 2-6. In April 2022, the Commonwealth filed a response asserting Wicker failed to specify the misconduct Officer Mason or Detective DeRose allegedly committed, and his allegation that Detective Mole fabricated, in a warrant application, a statement from Wicker's girlfriend that he kept a firearm in her bedroom, even if regarded as misleading,[2] could not have affected the trial result. *See* Commonwealth's Letter, 4/7/22, at 10-12. Wicker filed a response on August 30, 2022.

On September 12, 2022, the PCRA court issued a notice of intent to dismiss the petition pursuant to Pa.R.A.P. 907. Wicker filed a response. On October 6, 2022, the PCRA court dismissed the petition. Wicker filed a timely appeal and he and the PCRA court complied with Pa.R.A.P. 1925.

Before reaching the merits of Wicker's issues, we must consider whether the defects in his brief require dismissal of the appeal. Appellate briefs must conform materially to the requirements of the Pennsylvania Rules of Appellate Procedure ("Pa.R.A.P."), and this Court may dismiss an appeal if the defects in the brief are substantial. *See **Commonwealth v. Tchirkow***,

---

[2] Wicker claimed the detective perjured himself by stating Ms. Cooper said Wicker had a black revolver in her bedroom when she told the detective Wicker had a black revolver "either on him or . . . at my house." *See* Wicker's Memorandum of Law, 12/21/21, at 4.

160 A.3d 798, 804 (Pa. Super. 2017). "Although this Court is willing to construe liberally materials filed by a *pro se* litigant, a *pro se* appellant enjoys no special benefit. Accordingly, *pro se* litigants must comply with the procedural rules set forth in the Pennsylvania Rules of the Court." ***Id***. (citation omitted). It is an appellant's duty to present arguments that are sufficiently developed for our review. An appellate brief must support its claims with pertinent discussion, references to the record, and citations to legal authorities. ***See Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007). "This Court will not act as counsel and will not develop arguments on behalf of an appellant." ***Id***. If a deficient brief hinders this Court's ability to address any issue on review, the issue will be regarded as waived. ***See Commonwealth v. Gould***, 912 A.2d 869, 873 (Pa. Super. 2006) (holding an appellant's failure to support his claim with factual background and citations to the record represented "serious deviations from the briefing requirements of the Rules of Appellate Procedure," waiving review of the claim) (citation omitted).

Wicker's brief fails to comply with multiple rules of appellate procedure. It does not contain: a statement of jurisdiction (***see*** Pa.R.A.P. 2114), a statement of order or other determination in question (***see*** Pa.R.A.P. 2115), a statement of both the scope of review and the standard of review (***see*** Pa.R.A.P. 2111(a)(3)), a statement of the questions involved (***see*** Pa.R.A.P. 2111(4), a statement of the case (***see*** Pa.R.A.P. 2117), or a summary of

argument (*see* Pa.R.A.P. 2118). Of even greater importance, Wicker's brief is devoid of any references to or discussion of applicable legal standards, and statutes. *See* Pa.R.A.P. 2119(a) (providing the argument shall be followed by the discussion and citation of pertinent authorities). Nor does Wicker's brief direct this Court to the places in the record where the matters he refers to can be found. *See* Pa.R.A.P. 2119(c) (providing where the argument references evidence or other matter, it must set forth a reference to the place in the record where that matter may be found); Pa.R.A.P. 2119(d) (providing that where a finding of fact is argued, the argument must contain a synopsis of all evidence on the point, with a reference to the place in the record where the evidence may be found).

Given these deficiencies, this Court is unable to meaningfully review the issues Wicker purports to raise. Accordingly, Wicker's failure to conform with our appellate rules compels the dismissal of the appeal. *See* Pa.R.A.P. 2101 (providing that "if the defects . . . in the brief . . . are substantial, the appeal . . . may be . . . dismissed").[3]

---

[3] To the extent Wicker asserts he pled newly-discovered facts concerning police misconduct below pursuant to 42 Pa.C.S.A. § 9545(b)(1)(ii), meriting an after-discovered-evidence analysis under 42 Pa.C.S.A. § 9543(a)(2)(vi), no relief would be due. As the PCRA court explained, Wicker does not explain what role, if any, Officer Mason and Detective DeRose played at his trial, and his assertion of Detective Mole's misconduct, even if true, would not likely produce a different trial result given an eyewitness's identification of Wicker and cellphone evidence placing him at the scene of the crime. *See* PCRA Court Opinion, 4/18/23, at unnumbered 7-10, citing 42 Pa.C.S.A. §
*(Footnote Continued Next Page)*

Appeal dismissed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/7/2024

---

9543(a)(2)(vi); **Commonwealth v. Randolph**, 873 A.2d 1277, 1283 (Pa. 2005).